IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

WORD SEED CHURCH, *et al.,*

                Plaintiffs,           Case No. 20 C 7725

        v.                 Judge Harry D. Leinenweber

VILLAGE OF HAZEL CREST,

                Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiffs the Word Seed Church and Civil Liberties for Urban Believers motion for a preliminary injunction and a declaratory judgment, pursuant to FED. R. CIV. P. 57 and 65 (Dkt. No. 4) is denied.

## I. BACKGROUND

Plaintiffs the Word Seed Church and Civil Liberties for Urban Believers filed this motion seeking a preliminary injunction pursuant to Rule 65 and a declaratory judgement pursuant to Rule 57. Plaintiffs allege that the Zoning Ordinance governing land use in the Village of Hazel Crest (the "Village" or "Hazel Crest") unreasonably limits their First Amendment Free Exercise rights, as protected under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et. seq.,* and the Fourteenth Amendment's Equal Protection Clause and

is causing them serious, irreparable harm. The facts necessary to resolve Plaintiffs' motion are set forth below.

### A. The Parties

#### 1. The Word Seed Church

The Word Seed Church is a seven-member congregation in the south suburbs of Chicago. (Compl. ¶ 7, 13, Dkt. No. 1.) From its founding in 2000, until 2012, Word Seed met and worshipped at the home of its former Pastor, Katherine Brownlee. (*Id.* ¶ 15.) In 2012, Word Seed purchased property in south suburban Markham, Illinois, but was forced to sell that property in 2017 as a result of business redevelopment in the City of Markham. (*Id.* ¶ 17.) Following the sale of the Markham property, Word Seed resumed meeting and worshipping in Pastor Brownlee's home, and in 2018 moved its congregation to the home of its current pastor, Keinon Washington. (*Id.* ¶¶ 18–19.) Word Seed has renewed its search for a permanent facility and intends to buy property in Hazel Crest or one of the surrounding south suburbs of Chicago, Illinois. (Compl. ¶ 27.)

#### 2. Civil Liberties for Urban Believers

The Civil Liberties for Urban Believers ("CLUB") is an "unincorporated association of churches." (Compl. ¶ 7.) CLUB "exists to promote the religious liberty of urban churches and believers." (*Id.*) Word Seed is a member of CLUB. (*Id.*)

- 2 -

**B. Village of Hazel Crest's Zoning Regulations and Procedures**

*1. Overview of the Zoning Ordinance*

Hazel Crest adopted the current version of its Zoning Ordinance on January 29, 1997. (Zoning Ordinance at 1, Sawyer Decl., Ex. 1, Dkt. No. 18-1.) The Zoning Ordinance lists a variety of purposes including to "promote and to protect the public health, safety, morals, comfort, convenience, and the general welfare of the people" of Hazel Crest and to "protect residential, business, and manufacturing areas alike from harmful encroachment by incompatible uses and to insure no land shall be usurped by inappropriate uses." (*Id.*) To achieve these objectives, Hazel Crest's Zoning Ordinance divides the Village into the following districts:

- 4 residential districts (R-0, R-1, R-2, R-3);

- 1 "Special Planned Development" district (SPD);

- 1 office, research and compatible use district (M-OR);

- 2 business districts (B-1, B-2); and

- 1 limited manufacturing (M-1)

(*Id.* at 15–29; Zoning Map, Compl., Ex. B, Dkt. No. 15-3.) For each district, the Zoning Ordinance sets out certain specifications such as, minimum lot area (*see, e.g.,* Zoning Ordinance § 7.3 (c)), building height (*see, e.g., id.* § 7.3(f)), and the size of a

building's front, side, and rear yards. (*See, e.g., id.* §§ 7.3(h)–(j).)

In addition to the land and building size requirements, the Zoning Ordinance also sets out permitted and special uses within each district. The Zoning Ordinance defines a "permitted use" as a purpose or activity "which may be lawfully established in a particular district or districts, provided it conforms with all requirements, regulations and performance standards (if any) of such district." (*Id.* at 9.) A "special use" is a purpose or activity "which because of its unique characteristics cannot be properly classified as a permitted use in any particular district or districts." (*Id.*) Authorization to engage in a special use "may or may not be granted" after Hazel Crest has considered "the impact of such use upon neighboring land" and "the public need for the particular use at the particular location." (*Id.*) Finally, based upon an occupant's use of the property, the Zoning Ordinance prescribes additional requirements for the building or property. Article XIII also sets out regulations for off-street parking, including the location of such parking, the size of each parking space, and the number of spots needed for particular building uses. (*Id.* § 12.2.)

## 2.  *The "Special Use" Approval Process*

Occupants wishing to operate an enumerated special use in one of Hazel Crest's districts must obtain a special use permit. Permits are issued only after land users submit a special use application to the Village's Zoning Administrator. (*Id.* § 13.8(D).) The special use application is reviewed by the Village's 9-person Planning and Zoning Commission (the "Zoning Commission"). (*Id.* §§ 13.3(A), 13.8(E).) The Zoning Commission then prepares a written report outlining their findings, which must address the following:

> (1)   That the establishment, maintenance, or operation of the special use will not be detrimental to or endanger the public health, safety, morals, comfort or general welfare.
>
> (2)   That the special use will not be injurious to the use and enjoyment of other property in the immediate vicinity for the purposes already permitted, nor substantially diminish and impair property values within the neighborhood.
>
> (3)   That the establishment of the special use will not impede the normal and orderly development and improvement of surrounding property for uses permitted in the district.
>
> (4)   That adequate utilities, access roads, drainage and/or other necessary utilities have been or are being provided.
>
> (5)   That adequate measures have been or will be taken to provide ingress and egress so designed as to minimize traffic congestion in the public streets.

- 5 -

(6)     That  the  special  use  shall  in  all  other
respects  conform  to  the  applicable  regulations  of
the  district  in  which  it  is  located,  except  as  such
regulations  may  in  each  instance  be  modified  by  the
village  board  pursuant  to  the  recommendations  of  the
planning  and  zoning  commission.
(7)     Each  adult  use  shall  be  a  minimum  of  one
thousand  (1,000)  feet  from  the  property  line  of
another  adult  use.

(8)     Each  adult  use  shall  be  a  minimum  of  one
thousand  (1,000)  feet  from  any  previously  existing
church,  school,  library,  park  or  other  publicly
operated  recreational  facility.

(9)     All  distances  specified  shall  be  measured  by
following  a  straight  line,  without  regard  to
intervening  structures,  from  the  nearest  point  on
the  property  line  or  zoning  district  boundary  line
from  which  the  proposed  use  is  to  be  separated  to
the  nearest  point  of  the  property  on  which  the
proposed  use  is  to  be  located.

(10)    No  alcoholic  beverages  shall  be  sold,  served
or  consumed  within  the  premises  of  an  adult  use.

(*Id.* §§ 13.3(B), 13.8(E).) The Zoning Commission's written

recommendation is submitted to the Village Board of Trustees (*Id.*

§ 13.3(B).) Following a public hearing, the Village Board of

Trustees will authorize or deny the proposed special use. (*Id.*)

### *3.   Churches*

Hazel Crest's Zoning Ordinance expressly prohibits church

services in all business districts. (*Id.* at 19.) Churches are not

listed as a permissible or special use in the residential district

R-0, the "Special Planned Development" district, the office,

- 6 -

research and compatible use district, or the limited manufacturing district. (*Id.*at 15, 22–29.)

Churches are permitted as a special use in residential districts R-1, R-2, and R-3. (*Id.* 15-19.) As a special use, Churches operating in R-1, R-2, and R-3 must maintain a floor area ratio—the ratio of the building's area to the total area of the land—of no more than .6. (*Id.* §§ 7.3(E), 7.4(E), 7.5(E).) In districts R-1 and R-2, all special use buildings more than 35 feet tall must increase the size of their front, side, and back yards by two (2) feet, for every one (1) foot over 35 feet. (*Id.* §§ 7.3(k), 7.4(k).) No such change in yard size is required in district R-3. (*Id.* § 7.5.) Finally, churches must provide one (1) off-street parking space for every seven (7) seats in its building. (*Id.* § 12.2(J)(10).)

### 4. *The 2008 Amendment*

Hazel Crest has provided a copy of Ordinance 07-2008, entitled "An Ordinance Amending the Hazel Crest Zoning Ordinance by Amending the Permitted and Special Uses in the B-2 Zoning District." (2008 Zoning Amend. at 4–5, Sawyer Decl., Ex. 1-A, Dkt. No. 18-2.) The 2008 Amendment removes a number of permitted and special uses from the business districts, including art galleries, funeral parlors, meeting halls, daycare centers, libraries, recreational buildings

and community centers. (*Compare* Zoning Ordinance at 20-22 *with* 2008 Zoning Amend. at 3-4.)

According to the Village, this amendment "was never codified." (Supp. Resp. at 3, Dkt. No. 17.) The 2008 Amendment is, however, part of the record in *River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.,* 2008 WL 4865568, at *2-*3 (N.D. Ill. 2008). In *River of Life,* the district court concluded that the 2008 Amendment was "entitled to a presumption of validity" because Hazel Crest made a "*prima facie* showing" that the Village complied with the legal requirements for amending the Zoning Ordinance. *Id.* at *3. The district court, and later the Seventh Circuit on appeal, considered the 2008 Amendment when ruling on the River of Life Kingdom Ministries' motion for a preliminary injunction. *See River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.,* 585 F.3d 364, 369 (7th Cir. 2009) ("*River of Life* I") *reh'g en banc sub nom. River of Life Kingdom Ministries v. Vill. of Hazel Crest, Ill.,* 611 F.3d 367, 373-74 (7th Cir. 2010) (*en banc*) ("*River of Life* II").

### 5. *Deposition of Elliot Eldridge*

On February 19, 2021 and February 24, 2021 Plaintiffs deposed Elliot Eldridge, the Building and Zoning Administrator for the Village of Hazel Crest. Mr. Eldridge's testimony was taken in response to questions posed by the Court after review of the

parties' briefing on this motion for a preliminary injunction. (*See* 2/10/21 Minute Entry, Dkt. No. 23.).

Mr. Eldridge testified that the purpose of Hazel Crest's Zoning Ordinance is to ensure that land use does not adversely impact "the citizens or the properties around it." (2/19/21 Tr. at 6, Dkt. No. 26.) Mr. Eldridge explained that the Village's secretary is responsible for codifying changes to the Zoning Ordinance. (*Id.* at 51.) He could not explain, however, the reason that the 2008 Amendment had not been codified. (*Id.*)

Mr. Eldridge also testified regarding the special use permit application process. Mr. Eldridge stated that there is a $400 application fee but could not testify as to the expenses that may be incurred by an applicant to prepare their application. (*Id.* at 15–17.) Once submitted, a special use permit application is circulated to the Zoning Commission for their review, after which a public hearing is scheduled. (*Id.* at 15–16.) Prior to the public meeting, applicants are required to provide notice of their special use permit application to all residents within 250 feet of the at-issue property. (*Id.* at 14–15.)

At the public hearing before the Zoning Commission, the special use applicant presents their proposed land use and may receive questions from the Zoning Commission. (*Id.* at 17.) The hearing is also open to the public, who may voice their opinions

on the proposal. (*Id.* at 20.) If the Zoning Commission has follow-up requests the applicant will need to return for a follow-up hearing. (*Id.* at 18.) After evaluating the proposed special use, the Zoning Commission makes a recommendation to the Board of Trustees on whether to approve the application. (*Id.* 17–18) Applicants must then appear before the Village Board of Trustees, who will vote to approve or deny the special use permit application. (*Id.* at 17-18.)

The Zoning Commission meets monthly and the Village Board of Trustees meets twice per month, providing regular opportunities for applicants to present their materials and move the process forward. (*Id.* at 18-19.) According to Mr. Eldridge, the total time needed to secure approval for a special use permit depends on the completeness of the information submitted to the Zoning Commission. (*Id.*) During Mr. Eldridge's five-year tenure, four special use permit applications have come before the Zoning Commission. (*Id.* at 32.) During this time, only one special use, a sign, was approved and moved forward. (*Id.* at 34.) The approval process for the sign took "a couple [of] months." (*Id.*) The other special uses considered by the Zoning Commission included an application for a strip mall which was not recommended to the Village Board after two Zoning Commission meetings. (*Id.* at 33, 79) and an application related to a daycare facility which was

withdrawn following just one Zoning Commission meeting. (*Id.* at 33–34, 77–78.) Finally, Mr. Eldridge explained that a special use permit application for a cell tower was pending for approximately six months because many citizens attended the public hearings and the Zoning Commission had significant follow-up questions. (*Id.* 33, 78–79.) Mr. Eldridge stated that the special use permit for the cell tower was initially approved, but the applicant made some subsequent procedural errors that required resubmission, and that resubmitted application was not approved. (*Id.* at 78.)

Mr. Eldridge also explained that the Village allows land users to propose amendments to the Zoning Ordinance. (*Id.* at 131–32.) A "text amendment" revises the Zoning Ordinance, to permit a particular use or activity. (*Id.*) At a hearing on March 16, 2021, counsel for Hazel Crest also identified a "MAP amendment" which rezones a specific piece of property to permit a particular use or activity. (3/16/21 Tr. at 11.) According to Mr. Eldridge, the amendment process is similar to a special use permit application. An amendment is first proposed to the Zoning Commission. (2/19/21 Tr. at 131–32.) The Zoning Commission will review and make a recommendation to the Village Board of Trustees. (*Id.*) During the March 16, 2021 hearing, counsel for Hazel Crest further explained that in his experience zoning amendments are commonplace in most communities, however Hazel Crest is "something of a dormant

community because there is not much development activity one way or another." (3/16/21 Tr. at 11–12.)

During his deposition, Mr. Eldridge identified 15 churches currently operating in Hazel Crest. (*Id.* at 51.) Fourteen of the fifteen churches are located in Hazel Crest's residential districts. (*Id.* at 101–19). The final church, Valley Kingdom Ministries, is located in an industrial park. (*Id.* at 101.) The churches operating in Hazel Crest do so in a variety of facilities, from large venues, to small constructed structures, to converted homes, and a condominium. (Hazel Crest Church Photos, 2/19/21 Dep. Tr., Def. Ex. 3, Dkt. No. 26-2.) Mr. Eldridge also explained that Hazel Crest operates a Clergy Committee which is comprised of churches in the Village that make recommendations to the Village Board for advancing spiritual morale in the community. (2/19/21 Tr. at 119–20.)

Mr. Eldridge testified that under the Zoning Ordinance all property zoned as R-1, R-2, and R-3 is eligible for a special use permit to operate a church. (*Id.* at 102–03.) He further explained that he understood there to be dozens of vacant lots in the R-1, R-2, and R-3 districts. (*Id.*) Mr. Eldridge also reviewed a map of available residential properties, for which Word Seed could apply for a special use permit. (*Id.* at 41–44.) Mr. Eldridge later identified two churches, Bethel Apostolic Church and Greater Faith

Pentecostal Church, that may no longer be active and whose buildings could be of use to Word Seed. (*Id.* at 104, 108–09.) Mr. Eldridge further stated that potential land users wishing to locate in Hazel Crest can meet with the Village manager to "discuss their location and what they want[] to do." (*Id.* at 87.)

Finally, Mr. Eldridge explained that he understood Word Seed had reached out to Hazel Crest regarding the property located at 1822 W. 170th St. (*Id.* at 170.) The building was previously used as a post office and then was remodeled to be used as a daycare facility, using Tax Increment Financing (TIF) funds, meaning public funds were invested into the renovations in an effort to assist with Hazel Crest's revitalization efforts. (*Id.* at 133–34.) Because Hazel Crest invested public funds in the property to drive commerce, the Village advised that it would not consider allowing a church to operate at that location. (*Id.* at 134.) According to Mr. Eldridge, there has been no additional contact between Word Seed and Hazel Crest. (*Id.*)

## II. <u>LEGAL STANDARD</u>

Rule 65 governs the entry of a preliminary injunction. FED. R. CIV. P. 65. A preliminary injunction is an "extraordinary and drastic remedy" that is available only when "the movant, *by a clear showing,* carries the burden of persuasion." *Goodman v. Ill. Dep't of Fin. & Prof'l Reg.,* 430 F.3d 432, 437 (7th Cir. 2005) (quoting

*Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)) (emphasis in original). A party seeking a preliminary injunction must establish four elements: (1) a likelihood of success on the merits; (2) the movant will suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the movant's favor; and (4) an injunction is in the public interest. *Ill. Republican Party v. Pritzker,* 973 F.3d 760, 762 (7th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council,* 555 U.S. 7, 20 (2008)). To establish a likelihood of success on the merits the movant "need not show that it definitely will win the case," but the "mere possibility of success is not enough." *Id.* at 762-63. The Court reviews the record before it, including "memoranda, depositions, affidavits, exhibits and testimony of witnesses submitted by the parties in support of their respective positions" to determine whether the movant met their burden. *Thomas Nelson Inc. v. Henry Regnery Co.,* 375 F.Supp. 335, 339 (N.D. Ill. 1974).

If Plaintiffs establish a likelihood of success on the merits, the Court will weigh the remaining factors. Factors 2, 3, and 4 "are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Judge v. Quinn,* 612 F.3d 537, 546 (7th Cir.2010). Consequently, these factors are not weighed in isolation. Instead, the Court applies a "sliding scale" approach

under which "the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor plaintiff's position." *Turnell v. Centimark Corp.,* 796 F.3d 656, 662 (7th Cir. 2015). This analysis "is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 895-96 (7th Cir. 2001) (internal quotation marks and citations omitted).

Rule 57 governs declaratory judgments. FED. R. CIV. P. 57. The Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., further gives the Court discretion to "declare the rights and other legal relations of any interested parties seeking such a declaration." 28 U.S.C. § 2201. The Court has broad discretion to hear a declaratory judgment action and should do so where the resolution will "clarify[] and settl[e] the legal relations at issue and . . . terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.,* 819 F.2d 746, 749 (7th Cir. 1987) (internal quotation marks omitted).

## III.  <u>DISCUSSION</u>

Plaintiffs seek to preliminarily enjoin Hazel Crest from enforcing various restrictions on religious land use and ask the

- 15 -

Court to declare that the Zoning Ordinance violates the RLUIPA and the Fourteenth Amendment. In response, Defendant challenged Plaintiffs' standing to bring the underlying lawsuit. The Court analyzes each argument below, beginning with the threshold issue of Plaintiffs' standing.

## A. Standing

The authority of this Court extends only to actual cases and controversies, as defined by Article III of the U.S. Constitution. U.S. Const. art. III, § 2, cl. 1. The standing doctrine defines what makes an action a case or controversy and thus justiciable under Article III. *Lujan v. Def. of Wildlife,* 504 U.S. 555, 560 (1992). Standing has three elements: (1) an "injury in fact"; (2) a causal connection between the injury and the complained of conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Id.* The parties only dispute whether the Plaintiffs have established an injury in fact. Word Seed and CLUB, as the parties "invoking federal jurisdiction bear[] the burden of establishing these elements." *Id.* at 561. Both have met this burden.

### 1. The Word Seed Church

Word Seed has standing to bring the instant action. Article III requires that Word Seed's complained of injury be "concrete and particularized" and "actual or imminent, not

- 16 -

conjectural or hypothetical." *Susan B. Anthony List v. Driehaus,* 573 U.S. 149, 158 (2014) (quoting *Lujan*, 504 U.S. at 560) (internal quotation marks omitted). Word Seed is not required to expose itself to liability as a prerequisite to challenging Hazel Crest's zoning ordinance. *Id.* Instead, Word Seed has standing to seek pre-enforcement review of a statute where the threat of enforcement is imminent. *Id.* Word Seed meets the "injury in fact" requirement based on an alleged future injury because the complaint establishes: (1) an intent to engage in conduct with a constitutional interest; (2) the desired conduct is proscribed by statute; and (3) there is a credible threat of prosecution. *Id.* Word Seed has established each of the three elements necessary for standing based on future injury. First, Word Seed has alleged an intent to engage in conduct with a constitutional interest. Word Seed intends "to purchase property in the Village of Hazel Crest" for religious assembly and worship. (Compl. ¶ 27.) Word Seed has even identified the property at 1822 W. 170th St. in Hazel Crest as for sale and one that that meets the church's needs and is within its budget. (*Id.* ¶ 28.) Word Seed's religious exercises are protected by the establishment, free exercise, and assembly clauses of the First Amendment. U.S. Const. amend. I.

Second, despite the church's intent to purchase property in Hazel Crest Word Seed's operation of a church is at least in part

proscribed by Hazel Crest's Zoning Ordinance. Churches are expressly prohibited in business districts and not listed as permissible or special uses in residential district R-0, the "Special Planned Development" district, the office, research and compatible use district, or the limited manufacturing district. (Zoning Ordinance at 15, 19, 22–29.) In addition, while churches are permitted in the R-1, R-2, and R-3 districts, they are characterized as "special use" and require approval from the Village Board of Trustees. (Zoning Ordinance at 15–19, 38.) Word Seed, therefore, cannot operate as of right anywhere in Hazel Crest.

Finally, Word Seed faces a credible threat that Hazel Crest will enforce its Zoning Ordinance. In the criminal context, the threat of enforcement is credible "when a plaintiff's intended conduct runs afoul of a criminal statute and the Government fails to indicate affirmatively that it will not enforce the statute." *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n,* 149 F.3d 679, 687 (7th Cir. 1998). The Seventh Circuit has indicated that the same is true in the civil context. Citing to the foregoing quote, the Seventh Circuit affirmed that plaintiffs need not give government entities the opportunity to exercise their enforcement discretion. *Six Star Holdings, LLC v. City of Milwaukee,* 821 F.3d 795, 803–04 (7th Cir. 2016.) There is no

evidence to suggest that Hazel Crest will not enforce the Zoning Ordinance. To the contrary, Hazel Crest has defended the ordinance both in the briefing on the instant motion and in response to a similar challenge in 2008. (Supp. Resp. at 2-5, Dkt. No. 114.) *River of Life* II, 611 F.3d at 367.

Because Word Seed has adequately alleged that it is likely to experience a future injury, it has satisfied the "injury-in-fact" requirement. Word Seed has also pled the remaining elements of standing, causation and redressability. As alleged in the complaint, Word Seed's inability to purchase land in Hazel Crest is caused by the village's zoning ordinance. (Compl. ¶ 29-43.) Finally, Word Seed has alleged that the church has the funds to purchase property in Hazel Crest. (*Id.* ¶¶ 14, 28.) Thus, if the church successfully challenges Hazel Crest's zoning ordinance, it will be able to buy property, thereby addressing its alleged harm.

### 2. *Civil Liberties for Urban Believers*

CLUB also has standing to bring the instant action. The complaint includes just a single paragraph regarding CLUB, an association of churches to which Word Seed belongs. (Compl. ¶ 7.) The lone allegation regarding the association does not allege that CLUB has been directly harmed or will be directly harmed by Hazel Crest's zoning ordinance. (*Id.*) CLUB's lack of direct harm is not fatal, however, because "an association may have standing solely

as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). An association has Article III standing on behalf of its members where: "[1] its members would otherwise have standing to sue in their own right; [2] the interests it seeks to protect are germane to the organization's purpose; and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

The elements of associational standing are present here. First, Word Seed is a party to this action and has standing. Thus, at least one CLUB member would have standing to sue in their own right. *Warth,* 422 U.S. at 511 ("The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action."). Second, CLUB alleges that it "exists to promote religious liberty of urban churches and believers." (Compl. ¶ 7.) CLUB challenges Hazel Crest's Zoning Ordinance on the grounds that it restricts the free exercise of religion, an interest clearly germane to the promotion of religious liberty. *See C.L.U.B. v. City of Chicago,* 1996 WL 89241 at *14 (N.D. Ill. Feb. 27, 1996) (concluding CLUB's interest in a similar RLUIPA challenge was germane to its purpose). Finally, Plaintiffs seek a declaratory judgment and an injunction. (Compl. at 18–19.) This type of "prospective relief will usually inure to

the benefit of the members actually injured and thus" individual member participation is typically unnecessary. *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 603 (7th Cir. 1993). For these reasons, Word Seed and CLUB have standing to bring the present lawsuit.

## B. The Preliminary Injunction

Plaintiffs' claims are primarily based violations of RLUIPA. "Congress enacted RLUIPA and its sister statute, the Religious Freedom Restoration Act of 1993 ("RFRA"), 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.,* 'in order to provide very broad protection for religious liberty.'" *Holt v. Hobbs,* 574 U.S. 352, 357 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 693 (2014)). "RLUIPA is the latest of the long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens, consistent with [Supreme Court] precedents." *Cutter v. Wilkinson,* 544 U.S. 709, 714 (2005).

Plaintiffs' allege that Hazel Crest impermissibly restricts religious assembly. Specially, Plaintiffs allege that the Zoning Ordinance: (1) violates RLUIPA's prohibition of treating religious assembly or institution and similar secular land uses on unequal terms (Count I); (2) violates the Equal Protection Clause by treating secular assembly more favorably than religious assembly (Count II); (3) violates RLUIPA's prohibition on imposing

unreasonable limitations religious exercise (Counts III and V); (4) violates RLUIPA's prohibition on imposing regulations that totally exclude religious assemblies (Count IV); and (5) imposes unconstitutionally vague standards granting the Village impermissible discretion (Count VI). Plaintiffs only argue that they have a reasonable likelihood of success and are therefore entitled to a preliminary injunction based on Counts I–III.

For the reasons set forth below, the current record does not establish a likelihood of success on the merits on Counts I–III. Consequently, the motion for a preliminary injunction is denied.

### 1. *Count I: The RLUIPA Equal Terms Provision (42 U.S.C. § 2000cc(b)(1))*

RLUIPA's Equal Terms Provision, 42 U.S.C. § 2000cc(b)(1), states that "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). Count I of the complaint raises a facial challenge to the Zoning Ordinance, alleging that Hazel Crest places religious land use "on less than equal terms with nonreligious assembly uses" in violation of the RLUIPA Equal Terms Provision. (Comp. ¶ 47.) To succeed on a facial challenge, Plaintiffs must establish that "no set of circumstances exists under with the [Zoning Ordinance] would be valid." *Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 449 (2008).

The Seventh Circuit provides that a regulation violates the Equal Terms Provision "only if it treats religious assemblies or institutions less well than secular assemblies or institutions that are similarly situated as to" the accepted zoning criteria. *River of Life* II, 611 F.3d at 368, 370 (adopting a revised version of the Third Circuit's test for a violation of the Equal Terms Provision of the RLUIPA). To succeed on the merits, Plaintiffs need to demonstrate that comparable secular land uses are not treated the same "from the standpoint of an accepted zoning criterion, such as 'commercial district,' or 'residential district,' or 'industrial district.'" *Id.* at 373.

In *River of Life,* the en banc Seventh Circuit ultimately adopted the aforementioned test to scrutinize Hazel Crest's Zoning Ordinance—the same ordinance at issue in this litigation. In 2006, the River of Life church purchased property in Hazel Crest's B-2 district. *River of Life* I, 585 F.3d at 368. The B-2 district was, and still is, designated as a TIF district, meaning public funds are invested into improvements to assist with revitalization efforts. *Id.* Even though the Zoning Ordinance prohibits churches from operating in business districts, the River of Life Church applied for a special use permit. *Id.* at 369. The Village Board of Trustees denied the application. *Id.* The River of Life Church filed a suit and alleged, much like Plaintiffs here, that the Zoning

Ordinance violated RLUIPA's Equal Terms Provision by excluding religious activities, but not similarly situated secular assemblies from the Hazel Crest business districts. *Id.* River of Life also sought a preliminary injunction. *Id.* While the motion for a preliminary injunction was pending before the district court, Hazel Crest "amended its ordinance to also exclude community centers, non-religious schools, meeting halls, art galleries, and recreational buildings, among other uses, from zone B–2." *Id.*

The district court denied River of Life's motion for a preliminary injunction, as did a 3-judge panel on the Seventh Circuit. *Id.* at 369, 377. The en banc Seventh Circuit affirmed both prior orders, concluding River of Life had a low chance of success on the merits. *River of Life* II, 611 F.3d at 374. The en banc Seventh Circuit explained that the "[e]xclusion of churches from a commercial zone . . . is not unique to the Village of Hazel Crest." *Id.* at 373. Looking to the 2008 Amendment to the Zoning Ordinance, the Seven Circuit concluded that "this case is straightforward because, after the amendment to its zoning ordinance, Hazel Crest really was applying conventional criteria for commercial zoning in banning noncommercial land uses from a part of the village suitable for a commercial district because of proximity to the train station." *Id.* at 373–74.

Word Seed and CLUB raise a nearly identical claim to the one rejected by the Seventh Circuit in *River of Life*. Remarkably, Plaintiffs fail to even acknowledge the *River of Life's* dispositive holding, let alone offer a single explanation why this Court should reach a different conclusion. The closest Plaintiffs come is their sur-reply, which addresses the 2008 Amendment. While the Court acknowledges that in the intervening decade Hazel Crest has failed to codify or even publish to its website the 2008 Amendment, Plaintiffs sur-reply offers no evidence to suggest that the 2008 Amendment has been abandoned or has gone unenforced. Plaintiffs are free to explore the 2008 Amendment in discovery and make further arguments about its validity in later briefing. At this stage, however, the record offers no reason to reject the previously validated 2008 Amendment, and thus the Court declines to do so at this time. Accordingly, *River of Life* remains good law, and the exclusion of religious land use from Hazel Crest's business districts still does not violate the Equal Terms Provision.

Word Seed also argues that the Zoning Ordinance permits assembly halls outside the business district as of right, while religious uses are either excluded or required to obtain a special use permit results in facially unconstitutionally disparate treatment. Applying the *River of Life* rule, the Court must analyze

the zoning criteria, to determine whether similarly situated secular and religious entities are treated the same. *River of Life* II, 611 F.3d at 368, 370; *see also Truth Found. Ministries v. Vill. Of Romeoville,* 387 F.Supp.3d 896, 916–17 (N.D. Ill. 2016) (applying the *River of Life* standard). Here, Plaintiffs have only provided a list of purportedly similar secular assembly uses that are permitted as of right outside the business districts. (Compl. ¶ 32.) This is insufficient. To demonstrate a high likelihood of success on the merits, Plaintiffs must offer evidence or argument comparing the secular land uses to religious land use, such that the Court might conclude there is unequal treatment in the zoning designations. Without this additional evidence, the Court cannot conclude that Plaintiffs have a high likelihood of demonstrating that the decisions on how to treat religious land use outside the business district were not based on neutral, land-use reasons.

### 2. Count II: The Equal Protection Clause of the Fourteenth Amendment

The Fourteenth Amendment's Equal Protection Clause guarantees that "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV § 1. Count II alleges that Hazel Crest "does not treat similarly situated assembly uses equally" in violation of the Equal Protection Clause. (Compl. ¶ 51.)

- 26 -

The threshold question for constitutional challenges is the level of scrutiny applicable to the claim. Government actions that classify by race, alienage, or national origin "are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 440 (1985). Government actions that interfere with fundamental rights, like freedom of speech or religion, are subjected to heightened scrutiny. *Vision Church v. Vill. of Long Grove,* 468 F.3d 975, 1000 (7th Cir. 2006). An action that does not implicate a suspect class or a fundamental right, is subject to a rational basis test. *Id.*

On its face, the Zoning Ordinance does not classify property use on the basis of race, alienage, or national origin. The Court has already determined that the record does not suggest that the Zoning Ordinance facially discriminates on the basis of religion. Thus, for the purposes of this preliminary injunction motion the Court will apply rational basis scrutiny to the Plaintiffs' Equal Protection claim. *Id.* To succeed, Plaintiffs "must demonstrate 'governmental action wholly impossible to relate to legitimate governmental objectives.'" *Id.* at 1001 (quoting *Patel v. City of Chicago,* 383 F.3d 569, 572 (7th Cir.2004)). At this stage, however, there is no such evidence on the record. The Seventh Circuit has already recognized that Hazel Crest's Zoning Ordinance is tied to

the Village's legitimate interest in developing their business districts. *River of Life* II, 611 F.3d at 373–74. Furthermore, the record is silent as the purpose, or lack thereof, behind the zoning decisions for the remaining districts. The Court therefore cannot conclude that Plaintiffs have a likelihood of success as to Count II.

### 3. Count III: The RLUIPA Unreasonable Limits Provision (42 U.S.C. § 2000cc(b)(3)(B))

RLUIPA's Unreasonable Limits Provision, 42 U.S.C. § 2000cc(b)(3)(B), prohibits any "land use regulation that . . . unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." 42 U.S.C. § 2000cc(b)(3)(B). Count III raises two challenges to the Unreasonable Limits Provision. Plaintiffs first allege that Hazel Crest's special use permit process "unreasonably limits religious assemblies." (Compl. ¶ 54.) Plaintiffs also allege that the Zoning Ordinance imposes unreasonable limits because it "exclude[s] churches from all zoning districts other than three residential districts which are already substantially developed as residential units." (*Id.* ¶ 55.) Plaintiffs do not make clear whether Count III raises a facial or as applied challenge to the Unreasonable Limits Provision. Even so, given the underdeveloped record before the Court, at this stage both challenges have a low likelihood of success on the merits.

A facial challenge must establish that "no set of circumstances exists under with the [Zoning Ordinance] would be valid." *Washington State Grange,* 552 U.S. at 449. To succeed on an as applied challenge Plaintiffs must establish that in this context, application of the Zoning Ordinance violates RLUIPA's Unreasonable Limits Provision. *Truth Foundation Ministries,* 387 F.Supp.3d at 910 n.4 (limiting an as applied challenge the movant's particular circumstances). When examining a claim under the Unreasonable Limits Provision, the legislative history advises that "[w]hat is reasonable must be determined in light of all the facts, including the actual availability of land and the economics of religious organizations.'" *Vision Church,* 468 F.3d 975 at 990 (quoting 146 Cong. Rec. E1563 (daily ed. Sept. 22, 2000) (statement of Rep. Canady)). For a facial challenge the Court will evaluate what is reasonable as compared to all churches. *Truth Foundation Ministries,* 387 F.Supp.3d at 913. For an as applied challenge the Court will look to what is reasonable for small churches similarly situated to Word Seed. *Id.* at 914.

The Court first considers whether characterizing religious use as a special use in districts R-1, R-2, and R-3 is an unreasonable limitation. As a special use churches must comply with the special use floor area ratio, yard size, and parking requirements in each residential zone. (*Id.* §§ 7.3 (e), 7.3(k),

7.4(k), 12.2(J)(10).) In addition, to operate as a special use in Hazel Crest land users obtain a special use permit. (*Id.* § 13.) The application for the special use permit is reviewed by the Zoning Commission, based on the criteria set forth in the Zoning Ordinance. (*Id.* §§ 13.3(B), 13.3(E).) Following a public hearing, the Zoning Commission makes a recommendation to the Village Board of Trustees who ultimately decide whether to approve or deny the application. (*Id.* § 13.3(B).) According to Plaintiffs, the totality of these limits is unreasonable and violates the RLUIPA.

At this stage, the record offers little evidence to support Plaintiffs' claim that the designation of churches as a special use in residential districts violates the Unreasonable Limits Provision. To start, Plaintiffs' contend that the special use permit application process is "onerous and highly discretionary" and "unreasonably exposes [Word Seed] to 'delay, uncertainty, and expense.'" (Mem. at 13.) But the Seventh Circuit has already rejected generic assertions that a special use permit application process is highly discretionary where, as is the case here, "the Village's Zoning Regulations [] set forth the various factors to be considered by the Board in addressing an application for a special use." *Vision Church*, 468 F.3d at 990. In addition, there are currently more than a dozen churches operating in Hazel Crest. Without more evidence about when and under what processes the

- 30 -

presently operating churches were established, the Court is unlikely to conclude that there is no set of circumstances where the special use regulations present valid limitations on religious exercise.

The record also lacks details on the financial and time investment necessary to complete Hazel Crest's special use permit application process. Plaintiffs allege that special use applicants will need to hire experts to conduct traffic studies, engineers, architects, and surveyors which will cost tens of thousands of dollars and take anywhere from 6 to 12 months to complete. (Compl. ¶ 39–41.) As to timing, the only evidence on the record estimates the Village's time to review and make a decision once an application is submitted. On that point, Mr. Eldridge testified that timing depends on the preparedness of the applicant and whether the Zoning Commission or the Village Board of Trustees have any follow-up questions. (2/19/21 Tr. at 17–19.) Mr. Eldridge further explained that while some more complex applications have taken more than six months, it is possible that a well put together application could receive approval on a much shorter timeline. (*Id.*) Moreover, even if Plaintiffs' estimate of 6 to 12 months for approval is accurate, the record presents no evidence that religious applications take longer than secular applications or are approved at a much lower rate.

Relatedly, Plaintiffs' also estimate that a special use permit application requires an investment of tens of thousands of dollars. On its own, this estimate fails to establish unreasonable limits. First, the record provides no documentation to support this estimate. Second, even if the estimate is accurate, the record does not yet establish the economics of religious organizations, such as the cost of starting and running a church and providing for a church congregation. Plaintiffs must establish a record that the special use permit application cost, whether for all churches in a facial challenge or similarly situated churches in an as applied challenge, is unreasonable. No such financial record exists at this stage.

Based on the underdeveloped record, the Court has no basis to evaluate the experience of churches more generally or a smaller subset of churches comparable to Word Seed, to determine whether the special use designation places unreasonable limits on religious land use. Consequently, at this stage Plaintiffs' challenge to the special use designation as a violation of the Unreasonable Limits Provision, whether facial or as applied, does not have a high likelihood of success on the merits.

The Court next considers whether restricting religious land use to three residential districts is an unreasonable limitation. Plaintiffs allege that the Zoning Ordinance unreasonably limits

churches by only permitting religious land use in the substantially developed residential districts. (Compl. ¶ 55.) Plaintiffs argue that the special use limitations imposed on churches further limit the available properties that may be suitable for Word Seed to purchase and develop. (Mem. at 13.) According to Plaintiffs these limits are particularly onerous in light of Word Seed's "size and limited resources." (*Id.* at 12)

As to availability, Mr. Eldridge testified that there are many vacant lots and properties that are ripe for redevelopment in the Hazel Crest residential districts, as well as a number of churches that may no longer be operational and may be willing to sell their property to Word Seed. (2/19/21 Tr. at 41–42, 102–04, 108–09.) The record also establishes that the Zoning Ordinance does not totally foreclose religious use ever being permitted outside the residential zones. While the Zoning Ordinance currently forbids religious land use in the business districts, Mr. Eldridge explained that land users could pursue an amendment. (*Id.* at 131.) Indeed, during the March 16, 2021 hearing, Hazel Crest's attorney noted that "the Village Board may love [an amendment]. Why? Because it brings traffic to the shopping center at times." (3/16/21 Tr. at 21.) Word Seed appears to have attempted to open lines of communication with respect to the property at 1822 W. 170th St. (2/21/19 Tr. at 170.) But these conversations

ceased when Hazel Crest stated that they would not consider a religious use on that the property, which was redeveloped using government TIF funds. (*Id.*) As Mr. Eldridge acknowledged, however, there are various vacant properties in the business districts, not all of which are TIF investments. (*See, e.g., id.* at 38, 59, 62.)

On this record, the Court is unable to fully understand the availability of property in Hazel Crest that would be suitable for Word Seed. But even if it was, the record remains deficient. Plaintiffs concede that "Hazel Crest is a mature community with existing homes on almost every lot." (Mem. at 13.) Plaintiffs do not go on, however, to establish that the challenge in identifying suitable residential land is the result of limitations imposed by the Zoning Ordinance, and not simply the limited availability of land in a mature community. This is true whether considered in the context of all churches or a smaller subset of churches similarly situated to Word Seed.

In addition, the present record only includes generic information about the financial challenges Word Seed faces finding property in the residential districts. This is also insufficient. That Word Seed has an annual income of just $17,000 is just the starting point. The Court does not look at whether the Zoning Ordinance excludes Word Seed in its current financial state, but whether the Zoning Ordinance effectively limits all churches, in

a facial challenge, or similarly situated churches, in an as applied challenge, based on the necessary financial investment to purchase and develop land in Hazel Crest. The record, however, simply does not provide an estimate for the cost of buying and developing both secular and religious use land in Hazel Crest. Nor does it grapple with the fact that fifteen churches of various sizes already exist in Hazel Crest, with one small enough to operate out of a condominium. (2/19/21 Tr. at 51, 118-19.) Absent these comparators and an acknowledgment that more than a dozen churches have made the necessary financial investment, the Court cannot determine whether the Zoning Ordinance is reasonable, "in light of all the facts." *Vision Church*, 468 F.3d at 990. At this stage, the record does not support a conclusion that Plaintiffs are likely to succeed on a facial challenge to the Unreasonable Limits Provision.

For all the foregoing reasons, Plaintiffs have a low likelihood of success on Counts I-III. Having concluded that the Plaintiffs have a low likelihood of success, the Court will not consider the remaining preliminary injunction factors.

### C. Declaratory Judgment

Plaintiffs also seek a declaratory judgement under Rule 57. Plaintiffs ask the Court to declare the following: (1) the "specific provisions in the Village's zoning ordinance, and its

implementation of the same as applied to religious assemblies violate" the RLUIPA and the Equal Protection Clause; (2) "Section 8.1 of the Village's zoning ordinance which prohibits church services 'in any building designed for a business use' is invalid as excessively discretionary" and violates the Equal Terms Provision and the Equal Protection Clause; and (3) "the Village's special use standards are unconstitutionally vague and grant unbridled discretion to Village officials." (Mot. at 2–3, Dkt. No. 4.)

The Seventh Circuit has recognized that it is "well settled that the federal courts have discretion to decline to hear a declaratory judgment action, even though it is within their jurisdiction." *Tempco Elec. Heater,* 819 F.2d at 747. Courts have exercised that authority where a plaintiff "seeks a declaratory judgment that substantially overlaps its substantive claims." *Vill. of Sugar Grove v. F.D.I.C.,* 2011 WL 3876935, at *9 (N.D. Ill. Sept. 1, 2011). Here, Plaintiffs' request for declaratory relief asks the Court to declare that the Zoning Ordinance violates the RLUIPA and the Constitution, for the same reasons alleged in Counts I–VI. Because the declaratory judgment issues are duplicative of the substantive claims, the Court declines to hear the motion for declaratory judgment at this stage of the proceeding—well before the parties have taken discovery.

In addition, for the reasons set forth in Section III.B., *supra*, based on the current record Plaintiffs have a low likelihood of success on the merits. For these same reasons, the current record is insufficient to grant declaratory relief. For this separate reason, the Court also declines to hear the motion for declaratory judgment.

For these reasons Plaintiffs' motion for declaratory action pursuant to Rule 57 is denied.

### IV.   CONCLUSION

For the reasons stated herein, Plaintiffs' motion for a preliminary or permanent injunction and a declaratory judgment (Dkt. No. 4.) is denied.

**IT IS SO ORDERED.**

_____
      Harry D. Leinenweber, Judge
      United States District Court

Dated: 4/12/2021

- 37 -